# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Todd Keckhafer,

Plaintiff,

v.

The Prudential Insurance Company of America,

Defendant.

Civ. No. 01-1917 (RHK/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Scott K. Goldsmith, Goldsmith & Associates, Long Lake, Minnesota, for Plaintiff.

Charles O. Lentz and Thomas C. Kayser, Robins, Kaplan, Miller & Ciresi, Minneapolis, Minnesota; Lloyd Chinn and Neil Abramson, Proskauer Rose, New York, New York, for Defendant.

---

## Introduction

Plaintiff Todd Keckhafer commenced this diversity action against The Prudential Insurance Company of America ("Prudential") after Prudential terminated his employment. On June 3, 2002, Keckhafer filed an Amended Complaint alleging (1) wrongful termination and malicious wrong, (2) wrongful termination in violation of public policy, (3) wrongful termination and prima facie tort, (4) wrongful termination in violation of the express and implied-in-fact covenant of good faith and fair dealing and in violation of promises and representations through course of dealings, (5) common law fraud, (6) violation of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §



OCT 0 1 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

325F.69, and (7) defamation. Keckhafer seeks actual damages in an amount exceeding one million dollars and punitive damages of at least an additional one million dollars.

Before the Court is Prudential's Motion to Dismiss the Amended Complaint in its entirety, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Prudential argues that Keckhafer has failed to state a claim for malicious wrong, common law fraud, breach of an express covenant of good faith and fair dealing, or termination in violation of public policy. Prudential further contends that Minnesota courts do not recognize a cause of action for "prima facie tort" and that the Minnesota Prevention of Consumer Fraud Act does not apply to employment relationships. Finally, Prudential asserts that Keckhafer's defamation claim fails because the statements complained of are not defamatory as a matter of law. For the reasons set forth below, Prudential's Motion will be granted in part and denied in part.

## Background[1]

Prudential operates an office in Plymouth, Minnesota that provides, inter alia, alternative dispute resolution services to Prudential's current and past customers. (Am. Compl. ¶¶ 3, 4.) Keckhafer worked for Prudential in its Plymouth office, performing dispute resolution and financial services. (Id. ¶¶ 5, 6.) While working for Prudential,

---

[1] On a motion to dismiss for failure to state a claim, the district court must "accept as true all factual allegations contained in the complaint and afford the plaintiff all reasonable inferences to be drawn from those facts." Meyer v. City of Joplin, 281 F.3d 759, 760 (8th Cir. 2002).

Keckhafer quickly developed and demonstrated proficiency at his job and, according to the Amended Complaint, was generally held in high regard in the Minneapolis metropolitan financial services professional community. (Id. ¶ 10.) He received positive performance reviews in the years 1997 and 1998. (Id. ¶¶ 13, 14.)

Sometime in early 1999, Prudential distributed a "Roads to Resolution – Prudential's Employment Dispute Resolution Program" brochure to Keckhafer.[2] (Id. ¶ 56.) The brochure describes the program as consisting of four steps that employees may access in sequential order. The first step is for the employee to utilize existing internal avenues for resolving the issue, such as addressing the problem to local management, the employee's Human Resources representative, or the company's Employee Relations office. (July 24, 2002 Chinn letter Attach. (Roads to Resolution brochure) at 2-3.) If internal options for addressing the problem do not work, the second step of the process is for the employee to contact Prudential's RESOLVE Office, newly created for the Roads to Resolution program, whose staff are to "assist [the employee] in determining whether [he or she has] exhausted internal options and [can] proceed to the third and fourth steps of Roads to Resolution -- external, independent, professional mediation, and arbitration."[3]

---

[2] In the Amended Complaint, Keckhafer quotes extensively from the Roads to Resolution Program brochure. That document was not, however, attached to the Amended Complaint. Before the hearing, the Court requested a copy of the brochure from counsel for Prudential, who sent that document to the Court and opposing counsel.

[3] The Roads to Resolution Program brochure describes the RESOLVE Office as "the gatekeeper" to the external options of mediation and arbitration, steps three and four

(Id. at 2, 4.) Only "covered claims," as defined in the brochure, are eligible for mediation and arbitration through the Roads to Resolution program. (Id. at 4, 7.) If an employee is terminated from Prudential, any issues involving Prudential that arise from that termination of employment are subject to Roads to Resolution. (Id. at 13.)

In early 1999, Prudential received complaints that other supervisors in the Plymouth office were discriminating against and harassing employees. (Id. ¶ 18.) Keckhafer was not a subject of the complaints. (Id.) Prudential settled those claims of discrimination and harassment. (Id.) After the settlement, "the complainants frequently discussed with their peers the ease with which money was extracted from Prudential based upon the complaints of workplace discrimination and/or harassment." (Id. ¶ 19.) In the spring of 1999, a second group of employees at the Plymouth office, represented by the same counsel who had represented the first group, brought claims of workplace discrimination and harassment. (Id. ¶ 21.) According to Prudential, members of this second group of employees identified Keckhafer as having engaged in workplace discrimination and harassment. (Id.)

At the end of June 1999, Keckhafer received an overall performance review identifying him as a "Major Contributor to Results Who Often Exceeds Expectations." (Id. ¶ 15.) Keckhafer applied for and, based on his "outstanding performance reviews and accomplishments," received a promotion effective August 1, 1999. (Id. ¶ 17.)

---

of the process. (Roads to Resolution Program brochure at 11.)

On July 26, 1999, Stephen Dodson, Vice President of Human Resources at Prudential, and two Prudential attorneys met with Keckhafer to inquire about various complaints that apparently had been made against him. (Id. ¶ 22.) During that meeting, Prudential identified four employees as having made allegations that Keckhafer had engaged in acts of gender and race discrimination. (Id. ¶ 25.) Keckhafer vigorously denied the charges that Dodson described. (Id. ¶ 22.) "In response to Keckhafer's attempts to respond to the vague charges, Keckhafer was accused as coming off as a 'choirboy' and was told to take the remaining part of the day off work." (Id.)

By a letter dated July 27, 1999, Keckhafer requested, through his attorney, an enumeration of the charges of workplace discrimination and harassment made against him so that he could respond in an appropriate forum. (Id. ¶ 23.) Prudential did not provide that information to Keckhafer. (Id.) Prudential placed Keckhafer on paid leave pending an investigation without providing him an opportunity to respond to the investigation or advising him of the results of its investigation.[4] (Id. ¶ 31.) By a letter dated August 4, 1999, Keckhafer, through his attorney, informed Eric Schwimmer, Prudential's Deputy Chief Legal Officer for Human Resources, that he intended to invoke

---

[4] Keckhafer alleges that, in response to the discrimination and other employment claims of the co-employees, "Prudential denied that Keckhafer had done any[thing] illegal or improper." (Am. Compl. ¶ 34.) Keckhafer also alleges that, at some point after July 26, 1999, Prudential reported charges that a settlement system in which Keckhafer had been involved had not been properly administered. (Id. ¶ 33.) "An investigation by the supervising court concluded that the charges were baseless." (Id.)

his right to use the "Roads to Resolution" procedure.[5] (Id. ¶ 32.)

On October 18, 1999, Prudential terminated Keckhafer retroactive to September 22, 1999. (Id. ¶ 35.) In connection with that termination, Prudential offered Keckhafer a Separation and General Release agreement that called for him to waive his rights in exchange for $8,000, medical and dental coverage for six months, and undefined outplacement services. (Id. ¶ 36.) Keckhafer rejected the terms of the agreement. (Id.)

On October 22, 1999, Prudential filed a Form U-5 with the National Association of Securities Dealers ("NASD") stating that Keckhafer's termination had been due to "loss of confidence following receipt of complaints alleging inappropriate workplace conduct (non-compliance related). Employee denies the allegations." (Id. ¶¶ 41, 67.) The Amended Complaint states that "Prudential knew and intended that these statements would be available to and would be republished to prospective employers and others in the securities business considering the hiring or retention of Keckhafer in the securities business." (Id. ¶ 41.)

On November 17, 1999, Keckhafer, through his attorney, sent a letter to the "Roads to Resolution Program Administrator" invoking his right to the "Roads to Resolution" dispute resolution process. (Id. ¶ 37.) On December 28, 1999, Schwimmer contacted Keckhafer's attorney to schedule a mediation of Keckhafer's termination

[5] Keckhafer believed that he was unable to initiate the process before that date because he had been told during the July 26 meeting not to discuss the issues with anyone else in the company or there would be dire consequences. (Id. ¶ 32.)

during the year 2000. (Id. ¶ 38.) Prudential postponed the mediation, however, until a determination had been made on the discrimination claims brought by the complainants. (Id. ¶ 39.) To date, a mediation had not taken place. (Id.)

## Analysis

## I. Standard of Decision

"Dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and destined to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." Young v. City of St. Charles, Mo., 244 F.3d 623, 627 (8th Cir. 2001). A cause of action "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." Schaller Tel. Co. v. Golden Sky Sys., Inc., 298 F.3d 736, 740 (8th Cir. 2002) (internal citations omitted) (citing Kohl v. Casson, 5 F.3d 1141, 1148 (8th Cir. 1993)). In analyzing the adequacy of a complaint's allegations under Rule 12(b)(6), the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those facts. See Turner v. Holbrook, 278 F.3d 754, 757 (8th Cir. 2002); Meyer, 281 F.3d at 760.[6]

---

[6] From the parties' briefs, it appears that they assume that Minnesota law applies to all of the claims Keckhafer has asserted. Having been pointed to no conflict of law by the parties, the Court will also apply Minnesota law.

## II. Wrongful Termination and Malicious Wrong

Keckhafer alleges that "Prudential's actions, specifically including its termination of Keckhafer as a claims defense strategy even though Prudential had actual knowledge that the claims were not true, constitutes a malicious wrong or malicious injury." (Am. Compl. ¶ 41.) Keckhafer then details eight actions taken by Prudential that give rise to his "malicious wrong" claim:

> (1) On October 18, 1999, Prudential terminated Keckhafer retroactively to September 22, 1999;
>
> (2) In connection with the October 1999 termination, Prudential caused to be filed with the National Association of Securities Dealers (NASD) Form U-5 stating that Mr. Keckhafer's termination was due to "Loss of confidence following receipt of complaints alleging inappropriate workplace conduct (non-compliance related). Employee denies the allegations";
>
> (3) Prudential's statements in Form U-5 were false and malicious;
>
> (4) Prudential made the statements in Form U-5 knowing them to be false and made them recklessly for an improper purpose and not on a proper occasion;
>
> (5) Prudential knew and intended that these statements would be available to and would be republished to prospective employers and others in the securities business considering the hiring or retention of Keckhafer in the securities business;
>
> (6) Prudential knew and intended that Keckhafer's prospective employers and others in the securities business would read or receive the Form U-5 statements and would not hire or retain Keckhafer as a result thereof, and Prudential knew that by making such statements prospective employers and others in the securities business would not hire or retain Keckhafer because in the securities business, which is based on trust and integrity, Prudential's statements indicated that Prudential did not trust Keckhafer, that Keckahfer had engaged in sexual harassment and other inappropriate workplace behavior, and that

> Keckhafer was not trustworthy;
>
> (7) Prudential acted maliciously and with the intent to injure plaintiff in his business and employment and in fact injured Keckhafer in his business and employment; and
>
> (8) Prudential's termination of Keckhafer and its false statements in Form U-5 were understood by Keckhafer's prospective employers and others in the securities business that Prudential did not trust Keckhafer, that Prudential believed Keckhafer had engaged in sexual harassment and other inappropriate workplace behavior, and that Keckhafer could not be trusted.

(Id.) It also appears from the Amended Complaint that Prudential filed the Form U-5 with the NASD a few days after it had submitted a General Release to Keckhafer for his signature in connection with his termination and Keckhafer had declined to sign it. (Id. ¶¶ 23, 41.) Prudential moves to dismiss this claim on the grounds that Keckhafer's allegations do not fit the "malicious wrong" action recognized by Minnesota courts.

About sixty years ago, the Minnesota Supreme Court last addressed the common law claim for "malicious wrong." Marudas v. Odegard, 10 N.W.2d 233 (Minn. 1943). In that case, the defendant, one of two rival automobile dealers in the village of Milaca, had the following notice printed in the local newspaper on June 18, 1942:

> To All Owners of General Motors Cars in Our Territory: The service department of the [plaintiffs'] Chevrolet Garage being closed and the [plaintiffs'] Pontiac shop soon to follow, we have made arrangements with General Motors to be supplied with genuine G.M. parts that we may service your car for the duration.

10 N.W.2d at 234. The plaintiffs complained that the defendant maliciously intended to "blacken" their reputation and destroy their business, alleging that the words meant, by

innuendo, that plaintiffs were insolvent and that those words were being understood as such by plaintiffs' customers. Id. The plaintiffs asserted claims for defamation and "malicious injury to plaintiffs' business."

The supreme court took judicial notice of the fact that World War II was being fought at the time the notice was published and that the war had a tremendous impact on the economy, effecting "drastic changes in the business world and particularly in the automobile business." 10 N.W.2d at 234. The court concluded that, under all of those circumstances, an innuendo of insolvency or financial embarrassment was not warranted. 10 N.W.2d at 235. Hence, the complaint failed to state a cause of action for defamation.

With respect to the claim of "malicious wrong or malicious injury," however, the Minnesota Supreme Court held that the complaint sufficiently stated a cause of action. The Plaintiffs had alleged "that the published statement was false and malicious" and that it was calculated to and did injure plaintiffs' business. Id. It explained the difference between defamation and "malicious wrong" as follows:

> If the words are not in their nature defamatory, that is, if they have not injured the reputation of any one, no action of libel or slander will lie, however maliciously they were published. But if the defendant maliciously intended to injure the plaintiff by his words and succeeded in his malicious intent, and damage to the plaintiff was the direct result of the defendant's words, an action on the case will lie, whatever the nature of the words, provided they are untrue.

Id. (quoting Odgers, Libel and Slander, at 65). A claim for "malicious wrong" is not simply coextensive with a defamation claim. Indeed, it can provide relief where a

defamation claim fails.

Marudas is old -- it has passed through several decades with scarcely a comment by Minnesota courts, state or federal -- but it abides as a sound statement of the law in Minnesota. Thus, where a plaintiff alleges that a defendant maliciously intended to injure him or her by communicating false words and has succeeded in that malicious intent, and damage to the plaintiff is the direct result of the defendant's untrue words, a claim exists under Minnesota law upon which relief can be granted.

Taking as true the facts of the Amended Complaint, the basis of Keckhafer's "malicious wrong" claim appears to be the Form U-5 submitted to the NASD after Prudential terminated him. Keckhafer complains that Prudential knew he had not engaged in the conduct alleged by the employees who had complained against him and knew that it had not lost confidence in him. Therefore, it knew that the statements in the U-5 Form were false. Keckhafer further alleges that Prudential wrote the Form U-5 and submitted it to the NASD with the malicious intent of harming his prospects for getting another job. Finally, he alleges that he has been unable to get another job in the securities business because of the statements on the Form U-5. The Court concludes that Keckhafer has stated a claim for "malicious wrong." Dismissal of Count I is not warranted.

## III. Wrongful Termination in Violation of Public Policy / Whistleblower Act

Count II of the Amended Complaint alleges that Prudential violated both the common law and Minnesota's Whistleblower Act, Minn. Stat. § 181.932, when it

terminated Keckhafer as a claims defense strategy, knowing that the allegations against him were not true. Keckhafer alleges that "a pretextual termination of a manager or supervisor for a demonstrably false accusation of sexual harassment, known to be false, contravenes public policy," including section 363.11 of the Minnesota Statutes, and therefore states a common law cause of action for termination in violation of public policy. (Am. Compl. ¶ 46.) Keckhafer also asserts that he was terminated because he reported in good faith to Prudential that the allegations of harassment and other inappropriate workplace conduct were false and defamatory; hence, his termination violates subdivision 1(a) of the Minnesota Whistleblowers' Act. The Court considers each theory in turn.

## A. Common Law Termination in Violation of Public Policy

In 1987, the Minnesota Court of Appeals addressed the scope of the doctrine of at-will employment and several judicially-created exceptions to that doctrine. After reviewing cases from various jurisdictions recognizing a "public policy" exception to at-will discharge, the court of appeals concluded that "an employer's authority over its employee does not include the right to demand that the employee commit a criminal act." Phipps v. Clark Oil & Refining Corp., 396 N.W.2d 588, 592 (Minn. Ct. App.), aff'd, 408 N.W.2d 569 (Minn. 1987). The court of appeals therefore held that an employer is liable if it discharges an employee "for reasons that contravene a clear mandate of public policy." Id.

While the employer's appeal in Phipps was pending before the Minnesota Supreme Court, the Minnesota Legislature enacted the Whistleblower Act, Minn. Stat. § 181.932, which prohibits an employer from terminating an employee for several enumerated public policy reasons. Phipps v. Clark Oil & Refining Corp., 408 N.W.2d 569, 571 (Minn. 1987). The supreme court concluded that "the policy question of whether or not Minnesota should join the three-fifths of the states that now recognize, to some extent, a cause of action for wrongful discharge" was no longer before it, the legislature having codified the public policy exception recognized by the court of appeals. Id. (quoting Minn. Stat. § 181.932, subd. 1(c)). Framing the issue as "whether we should uphold the court of appeals' decision applying this public policy exception to the November 17, 1984 discharge of Phipps," the supreme court held that "an employee may bring an action for wrongful discharge if that employee is discharged for refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law." Id.; see also Abraham v. County of Hennepin, 639 N.W.2d 342, 351-52 (Minn. 2002) (observing that, because the employee in Phipps had been injured before enactment of the Whistleblower Act, that Act could not serve as the basis for his claim and the supreme court therefore had to decide whether he could proceed under the common law). Keckhafer has pleaded a claim for violation of the Whistleblower Act. No common law action for wrongful discharge in violation of public policy exists.

Assuming arguendo that a common law action co-exists with a statutory Whistleblower Act claim, the facts alleged by Keckhafer do not fit the legal theory articulated by the Minnesota courts. In reviewing Phipps, the Minnesota Supreme Court did not adopt a broad policy exception to the at-will doctrine. It specifically held that a cause of action exists where an employer has discharged an employee "for *refusing to participate in* an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law." Phipps, 408 N.W.2d at 571 (emphasis added); accord Abraham, 639 N.W.2d at 352 (stating that, in affirming the court of appeals in Phipps, the supreme court had "agreed that the common law protects those fired *for their refusal to violate the law*" (emphasis added)). Keckhafer does not allege that he was terminated because he refused to violate a state or federal statute or regulation. Rather, he claims that, although he was "innocent" of the charges of sexual harassment and other inappropriate workplace conduct, Prudential fired him because it was trying to minimize its exposure on those discrimination claims. Keckhafer's allegations do not fit within the narrow scope of the common law wrongful termination claim recognized by the Minnesota Supreme Court.

Accordingly, to the extent Count II of the Amended Complaint alleges a common law claim for termination in violation of public policy, that cause of action is dismissed for failure to state a claim.

**B. Minnesota's Whistleblower Act**

Keckhafer also alleges a violation of subdivision 1(a) of section 181.932 of the Minnesota Statutes, which provides that an employer cannot

> . . . discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (a) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official.

Minn. Stat. § 181.932, subd. 1(a). Keckhafer asserts that the conduct he reported to Prudential -- that his co-employees' accusations against him were false, fraudulent, and defamatory -- violated "federal and Minnesota laws of defamation, fraud and claims procedures under Title VII of the Civil Rights Act of 1964 . . . and the Minnesota Human Rights Act . . . Minn. Stat. § 549.211, subd. 1 and Rule 11."[7] (Am. Compl. ¶ 47.)

Prudential challenges the legal sufficiency of the Whistleblower Act claim on two grounds. First, it contends that Keckhafer was not making a report of his co-employees' activity in order "to expose an illegality." The Minnesota Supreme Court has stated that the Whistleblower Act "protects the conduct of a neutral party 'who "blows the whistle" for the protection of the general public or, at the least, some third person or persons in

---

[7] Although Keckhafer argues in his opposition memorandum that he was also informing Prudential about meetings that were taking place in the workplace to recruit complainants and to identify the types of claims to be made, that factual assertion does not appear in the Amended Complaint.

addition to the whistleblower.'" Obst v. Microtron, Inc., 614 N.W.2d 196, 200 (Minn. 2000) (quoting Williams v. St. Paul Ramsey Med. Ctr., Inc., 551 N.W.2d 483, 484 n.1 (Minn. 1996)). Expanding on that concept, the majority in Obst observed that

> Under the whistle-blower statute, establishing that an employee reported violations or suspected violations of law to his or her employer does not end the inquiry. The critical question of whether those reports were made in good faith must also be answered. In order to determine whether a report of a violation or suspected violation of law is made in good faith, we must look not only at the content of the report, but also at the reporter's purpose in making the report. **The central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose an illegality**.

Obst, 614 N.W.2d at 202 (emphasis added). Thus, where the employee's purpose, at the time of making the reports, was not to protect the public or some third persons, but rather to protect his own job, the good faith requirement of the Whistleblower Act is not met. Id. (citing Wolcott v. Champion Int'l Corp., 691 F. Supp. 1052, 1059 (W.D. Mich. 1987)). Given the procedural posture of the case, the Court must take as true the factual allegations of the Amended Complaint. Considered in that light, the Court cannot conclude, as a matter of law, that Keckhafer did not act in good faith for the benefit of someone other than himself. The Court therefore rejects Prudential's first argument against Keckhafer's Whistleblower Act claim.

Prudential also contends that the Whistleblower Act claim fails because Keckhafer has failed to allege that he reported "a violation or suspected violation of a federal or state law or rule." Keckhafer responds that, under the Whistleblower Act, he was reporting

"that fraud and defamation was taking place, and that Prudential was permitting [it] to take place, in the Prudential workplace. For that he was fired."[8] (Pl.'s Mem. Opp'n Mot. to Dismiss at 6.) Prudential replies that the Whistleblower Act does not apply to reports of conduct actionable only under the common law. The Court agrees.

In Obst, the supreme court concluded that reports of conduct that would constitute a common-law breach of a contract between the employer and a third person did not fall within the scope of the Whistleblower Act because they did not implicate a violation or suspected violation of a federal or state law or rule adopted pursuant to law. Obst, 614 N.W.2d at 204; compare Hedglin v. City of Willmar, 582 N.W.2d 897, 902 (Minn. 1998) (holding that a whistleblower's reports that a firefighter falsified roll call sheets and therefore was paid for calls he did not attend implicated the violation of several state statutes, including those making it unlawful for public employees to make a false demand

---

[8] In the Amended Complaint, Keckhafer alleged that his co-workers' complaints against him also violated the claims procedures of Title VII and the Minnesota Human Rights Act, and Rule 11 of the Federal Rules of Civil Procedure. (Am. Compl. ¶ 47.) Prudential argues that these alleged violations fail to state a claim because Keckhafer failed to allege that the co-workers had initiated any employment discrimination proceedings at the time he "reported" their conduct to Prudential. In opposing dismissal of the Whistleblower Act claim, Keckhafer makes no reference to the claims procedures under Title VII or the Minnesota Human Rights Act; he only discusses his reports to Prudential of fraud and defamation. (Pl.'s Mem. Opp'n to Mot. to Dismiss at 6.) Although it is not necessary for the plaintiff to identify in the pleading the specific statute or rule he or she suspected was being violated, see Abraham, 639 N.W.2d at 354-55, it is necessary for the plaintiff, on a motion to dismiss a complaint in which he has specifically identified several statutes or rules, to address arguments directed toward the legal sufficiency of those allegations. Having failed to do so, the Court deems those bases for Keckhafer's Whistleblower Act claim to have been waived.

for payment on a government entity and to present a false claim for payment to a public body).[9] The Court has found no case under Minnesota's Whistleblower Act in which a plaintiff's report of coworkers' conduct that could be actionable in tort constituted a "report" of a "violation or suspected violation of any federal or state law or rule adopted pursuant to law." Keckhafer's allegations that he was reporting conduct by his co-employees that could give rise to common-law causes of action against those co-workers do not, as a matter of law, state the basis for a Whistleblower Act claim. For that reason, the Court will grant Prudential's motion to dismiss Count II.

## IV. Wrongful Termination and Prima Facie Tort

In Count III, Keckhafer alleges that Prudential's termination of him "as a claims defense strategy even though [it] had actual knowledge that the claims were not true constitutes a prima facie tort." (Am. Compl. ¶ 51.) Keckhafer asserts that Prudential is liable to him because it intentionally and unjustifiably caused him injury. (Id.)

---

[9] The Minnesota Supreme Court recently rejected "the importation of a public policy requirement into the whistleblower statute and [held] that the protections of section 181.932, subd. 1(a) are not limited to reports that implicate public policy." Anderson-Johanningmeier v. Mid-Minnesota Women's Center, Inc., 637 N.W.2d 270, 277 (Minn. 2002). In so doing, it engaged in an exhaustive review of cases construing the Whistleblower Act. That review did not, however, address its prior analysis in Obst, in which the plaintiff complained that her employer was deviating from its obligations to a third party to test products: "While [that conduct] . . . may have implicated a violation of the control plan or a breach of its contract with Ford, the deviation did not implicate a violation of law." Obst, 614 N.W.2d at 204.

Prudential argues that Keckhafer has failed to establish the existence in Minnesota of a cause of action for "prima facie tort." The Minnesota Court of Appeals has indicated, in an unpublished decision, that "[s]tates that recognize a prima facie tort define the action similarly to the Restatement (Second) of Torts § 870 (1977)."[10] New Creative Enterps., Inc. v. Dick Hume & Assocs., Inc., No. C1-92-1423, 1993 WL 4127, at *1 (Minn. Ct. App. Jan. 12, 1993). Keckhafer has not presented to the Court, nor has the Court itself found, any cases pertinent to this jurisdiction – federal or state – that recognize a cause of action for "prima facie tort" in Minnesota.

In this case, recognition of a cause of action for "prima facie tort" arising out of what is essentially claimed to be a "bad faith" termination of employment would eviscerate the long-standing judicially-created doctrine of at-will employment, giving every discharged employee a nebulous tort action against the former employer. As the Phipps opinions from the Minnesota Court of Appeals and Minnesota Supreme Court vividly demonstrate, Minnesota's appellate courts thoroughly and carefully consider any modifications to the doctrine of at-will employment. They have not engaged in such an analysis with respect to a cause of action for "prima facie tort." Nor shall this Court. Prudential's motion will be granted on Count III of the Amended Complaint.

---

[10] "One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability." Restatement (Second) of Torts § 870 (1979).

## V. Wrongful Termination in Violation of an Implied Covenant of Good Faith and Fair Dealing

Keckhafer asserts in Count IV of the Amended Complaint that Prudential "made numerous promises, statements, representations and other communications that Keckhafer was entitled to be treated fairly, ethically, honestly, and in good faith." (Am. Compl. ¶ 55.) Keckhafer lists twenty sentences and phrases from Prudential's Roads to Resolution Program brochure that he alleges were affirmative representations by Prudential about how the company would treat him as an employee. (Am. Compl. 1st ¶ 56.) He also alleges that Prudential reiterated these representations during training he received for the company's progressive discipline program and that Prudential "confirmed and enforced the representations of fairness and good faith" in Keckhafer's performance reviews. (Am. Compl. 2d ¶ 56.) Keckhafer complains that Prudential "breached its express and implied promises, statements, representations and agreements," and "did not perform in the manner to which it specifically and expressly agreed." (Id. ¶ 57.)

The core allegation of Count IV is that Prudential wrongfully terminated Keckhafer in violation of an express and/or implied-in-fact covenant of good faith and fair dealing and/or in violation of promises and representations made during the course of the parties' dealings. Keckhafer's claim of an implied-in-fact covenant of good faith and fair dealing appears to be based on the Minnesota Supreme Court's holding that documents such as employee manuals may, under certain circumstances, give rise to an

implied-in-fact employment contract with terms that prevent the employee's termination at will. See Pine River State Bank v. Mettille, 333 N.W.2d 622, 627 (Minn. 1983).

Given the numerous quotations from the Roads to Resolution brochure in Count IV of the Amended Complaint, and the fact that it was not attached to the Amended Complaint, the Court requested a copy of that document.[11] Neither at the hearing on Prudential's motion nor at any time since has the Court received any objection from Keckhafer's counsel to the accuracy of the copy the Court received.

Prudential argues that the generalized policy statements found in the brochure (and stated at certain training meetings) are too indefinite to constitute a modification of Keckhafer's at-will employment relationship. "[R]egardless of whether the claim is

[11] Although consideration of documents outside of the complaint generally would require the Court to convert the 12(b)(6) motion into a summary judgment motion, the Eighth Circuit and several other circuits have held that a district court may consider documents that are central to a plaintiff's claim even though they are not attached to the complaint. See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 n.9 (8th Cir. 1997); see also Gryl ex rel. Shire Pharms. Group PLC v. Shire Pharms. Group PLC, 298 F.3d 136, 140 (2d Cir. 2002) (holding that a court deciding a motion to dismiss is "free to consider documents that are incorporated into the complaint by reference or attached to the complaint as exhibits, or whose terms and effect are relied upon by the plaintiff in drafting the complaint"); 188 LLC v. Trinity Indus., Inc., 300 F.3d 730, 735 (7th Cir. 2002) (holding that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to plaintiff's claim"); Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002) (holding that "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity"); Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (holding that "[w]hen the complaint relies upon a document, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss.").

based on oral or written statements, or a combination of both," the question of whether an employer has offered its employee an "implied-in-fact" contract is a question of law to be resolved by the court. Martens v. Minnesota Min. & Mfg. Co., 616 N.W.2d 732, 740 (Minn. 2000). Based on the Court's review of the relevant case law, and Keckhafer having cited no authority to the contrary, the Court agrees with Prudential's assertion that the statements described in the Amended Complaint are insufficient as a matter of law to modify the at-will employment relationship. E.g., Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1208 (8th Cir. 1997) (holding that employee handbook language that employees may be terminated for "just cause" and that the employer deals with its employees "fairly and in good faith" lacked the specificity and definiteness required of a unilateral contract under Minnesota law); Fox v. T-H Continental Ltd. P'ship, 78 F.3d 409, 414 (8th Cir. 1996) (holding that supervisor's statements that employee's position would be "long term," and "would be part of the turnaround of the hotel," and that she could do very well for herself do not constitute clear and definite promises for continued employment terminable only for cause); Mudlitz v. Mutual Serv. Ins. Cos., 75 F.3d 391, 394 (8th Cir. 1996) (rejecting employee's argument that employer reformed her at-will contract into a terminable-for-cause only contract by warning her that she would be terminated in thirty days if her work behavior did not improve).

That conclusion is buttressed by the "Roads to Resolution" brochure itself. A paragraph entitled "Impact of the Program on Your Employment" provides in pertinent

part as follows:

> Roads to Resolution creates more options for resolving your employment-related issues. The Program does not create a contract of employment, express or implied, for any period of time or guarantee that your employment will end only under certain conditions. The Program does not alter or modify the "at will" employment relationship that exists between you and the company.

(Roads to Resolution brochure at 8.) Such language constitutes a clear disclaimer by Prudential of any intent to create enforceable contractual obligations through the representations made in its brochure.[12] Ewald v. Wal-Mart Stores, Inc., 139 F.3d 619, 622 (8th Cir. 1998) (holding there was no "just cause" employment contract based upon Wal-Mart's "Coaching for Improvement" program where, "whatever members of management may or may not have stated, the company expressly disclaimed any contractual guarantee of specific discipline" or disciplinary procedures in writing); see also Michaelson v. Minnesota Mining & Mfg. Co., 474 N.W.2d 174, 180 (Minn. Ct. App. 1991) (holding that an express disclaimer in an office operating manual is a valid expression of the employer's intent not to create an implied-in-fact contract, preventing employee from claiming rights under that document), aff'd, 479 N.W.2d 58 (Minn. 1992).

---

[12] The purpose of the narrow exception to Rule 12(b)(6) motions that allows district courts to consider, on a motion to dismiss, documents that are central to plaintiff's claim without converting the motion into one for summary judgment under Rule 56 is to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents. 188 LLC v. Trinity Indus., Inc., 300 F.3d 730, 735 (7th Cir. 2002). Counsel for Keckhafer obviously had the Roads to Resolution brochure before him in order to quote from it in the Amended Complaint, yet he did not attach it to the pleading, thereby keeping the disclaimer language from the Court.

Given the generalized nature of the statements and "promises" that Keckhafer asserts were made to him, and the clear disclaimer language quoted above, the Court determines that there is no set of facts under which Keckhafer can establish the existence of an implied-in-fact contract that modified his "at will" employment relationship with Prudential. Nor can he establish the existence of an express covenant of "good faith" or an enforceable promise. Poff v. Western Nat'l Mut. Ins. Co., 13 F.3d 1189, 1191 (8th Cir. 1994) (holding that the same specificity required to modify the at-will relationship is also required to create an express covenant of good faith and fair dealing). The Court concludes that dismissal of Count IV of the Amended Complaint is warranted.

## VI. Common Law Fraud

Keckhafer asserts in Count V of the Amended Complaint "that statements in [Prudential's] Employment Dispute Resolution Program, its policies, the response to the complainants' claims, its mediation process, its performance reviews, and the actions surrounding and leading up to Keckhafer's termination" were made with knowledge of their falsity. (Am. Compl. ¶ 61.)

To state a claim for fraud, Keckhafer must demonstrate that: 1) Prudential made a false representation of past or present material fact that is susceptible to knowledge; 2) Prudential either knew the representation was false or asserted it as true without knowing it was true or false; 3) Prudential intended Keckhafer to act on the false representation; 4) Keckhafer did, in fact, act in justifiable reliance on the false representation; and 5)

Keckhafer suffered damages as a proximate cause of the representation. Evertz v. Aspen Med. Group, 169 F. Supp. 2d 1027, 1030 (D. Minn. 2001) (Tunheim, J.) (citing cases). Prudential argues that Keckhafer has not pleaded fraud with the requisite particularity under Rule 9(b). It further contends that the statements on which Keckhafer bases his fraud claim are not actionable because they are either generalized and indefinite statements or representations and expectations as to future events.

"In all averments of fraud, or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The Eighth Circuit has explained that the "circumstances constituting fraud" include "'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby. . . . [C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule.'" Parnes, 122 F.3d at 549 (quoting Commercial Property Invs., Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 644 (8th Cir. 1995)). The only allegedly false representations for which Keckhafer has adequately pleaded the circumstances constituting fraud are the statements found in the Roads to Resolution brochure.[13] (Pl.'s

[13] The Amended Complaint goes on to state that

> Prudential made numerous similar representations to Keckhafer in the training, instruction and requirements for progressive discipline of people reporting to Keckhafer and other supervisors, and in Keckhafer's performance under the performance management. Such representations were made on a continual basis, including specific progressive discipline training sessions.

Mem. Opp'n to Mot. to Dismiss at 11.) As for the requirement that Keckhafer also plead with particularity "what was obtained or given up" as a result of the misrepresentations, Parnes, 122 F.3d at 549, Keckhafer alleges that he "made his commitment to a future at Prudential based on the repeated representations of fairness, equity, and concern for the employee," and that "[i]f Prudential had honestly disclosed its intentions and the falsity of its representations, Keckhafer could have left Prudential on his own terms." (Am. Compl. 2d ¶ 56.) Thus, taking as true the allegations of the Amended Complaint, it appears that Prudential obtained Keckhafer's continued labor as a result of the representations at issue.

"It is well-established that an at-will employee who merely continues to work and does not demonstrate to have turned down other offers of employment based on an

---

> Each of Keckhafer's performance reviews confirmed and enforced the representations of fairness and good faith. The specific dates of the training and representations are not known at this time but are verifiable from Prudential records. The dates of Keckhafer's performance reviews are determinable from the written reviews. The representations generally took place in the Prudential workplace. Prudential made the misrepresentations in the "Roads to Resolution," and Prudential trainers made the misrepresentations at the Prudential training sessions on progressive discipline. Keckhafer's supervisors and managers made the misrepresentations in connection with his performance reviews.

(Am. Compl. 2d ¶ 56.) These allegations fail to "read like the opening paragraph of a newspaper article . . . [containing] the "who, what, when, where and how" of the alleged fraud." United States ex rel. Alsaker v. CentraCare Health System, Inc., Civ. No. 99-106 (JRT/RLE), 2002 WL 1285089 at *3 (D. Minn. June 5, 2002) (Tunheim, J.). Having quoted at length from his performance reviews for 1997, 1998, and 1999 (Am. Compl. ¶¶ 13 - 16), again not attaching those documents to the pleading, the Court cannot fathom how Keckhafer failed to plead with specificity at least the dates of those reviews, who was present, what allegedly false representations were made at that time, and by whom.

employer's representation is legally insufficient to show reliance" as required for a common law fraud claim. Evertz, 169 F. Supp. 2d at 1031 (citing cases). Here, it is uniquely within Keckhafer's knowledge and control as to whether he declined any job offers or passed up any concrete opportunity to look for other jobs after the allegedly false representations were made to him. He has made no such allegation, asserting simply that he continued to work for Prudential. As a matter of law, Keckhafer's allegations of reliance are neither adequate under Rule 9(b) nor legally sufficient under Evertz.[14] Accordingly, dismissal of Keckhafer's common law fraud claim is warranted.

## VII. Statutory Fraud

Keckhafer also alleges in Count V of the Amended Complaint that Prudential's statements were false and fraudulent in violation of section 325F.69 of the Minnesota Statutes. (Am. Compl. ¶ 63.) Keckhafer argues that (1) he was selling his "services" to Prudential for a salary, (2) "services" are considered "merchandise" under the consumer fraud statute, and (3) the transaction is therefore covered by the statute. This argument

---

[14] In its motion to dismiss Keckhafer's original Complaint, Prudential argued that Keckhafer had not pleaded fraud with the requisite specificity to satisfy Rule 9(b). Keckhafer responded in his opposition brief that if additional pleading was necessary, he would be willing to amend the Complaint. The Court construed those assertions as an expression of Keckhafer's intent to amend the Complaint as a matter of right. It therefore established with counsel a schedule for filing and serving an Amended Complaint and whatever renewed motion to dismiss Prudential wished to bring. Keckhafer has therefore had a full and fair opportunity to amend the complaint, with notice from Prudential's initial briefs of the alleged defects in the pleading. Having failed on a second attempt to plead fraud with specificity, Keckhafer will not be granted further opportunities to amend his pleading.

runs contrary to the purpose and language of the statute.

The Minnesota Prevention of Consumer Fraud Act was enacted "to counteract the seller's disproportionate marketing power present in consumer transactions." D.A.B. v. Brown, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) (citing State by Humphrey v. Alpine Air Prods., Inc., 500 N.W.2d 788, 790 (Minn. 1993)). The Minnesota Supreme Court has observed that, although "[t]he word 'consumer' appears nowhere in the [statute], . . . the statutory purpose of protecting consumers was clear from its inception when it was presented to the legislature in 1963." Ly v. Nystrom, 615 N.W.2d 302, 308 (Minn. 2000).

Keckhafer has come forward with no authority to support a determination by this Court that his employment relationship with Prudential is a "consumer transaction." Indeed, this Court has previously rejected an effort to read the Prevention of Consumer Fraud Act as broadly as Keckhafer would read it here:

> Plaintiff itself has bought nothing . . . . Rather, **the fraud alleged relates to plaintiff's employment relationship with defendant**. Plaintiff invokes the statute not to protect itself as a consumer, but to protect its business relationship with defendant. Such a broad reading of the statute would render it applicable to any contract remotely related to the ultimate sale of merchandise. It is unlikely that the Legislature intended the Consumer Fraud Act to have such broad application.

Cooperman v. R.G. Barry Corp., 775 F. Supp. 1211, 1213-14 (D. Minn. 1991) (MacLaughlin, J.) (emphasis added). Keckhafer attempts to distinguish Cooperman on the grounds that the plaintiff there was an "independent contractor," not an employee. That argument misses the crucial point in Judge MacLaughlin's analysis. A claim aimed

at protecting the plaintiff's employment relationship with the defendant does not lie under the Prevention of Consumer Fraud Act. Whether the plaintiff in Cooperman was an independent contractor or an employee does not impact that analysis. Keckhafer cannot state a claim under the Minnesota Prevention of Consumer Fraud Act upon which relief can be granted. In light of the Court's determinations as to Keckhafer's claims for both common law fraud and statutory fraud, it will dismiss Count V in its entirety.

**VIII. Defamation**

The basis of Keckhafer's defamation claim in Count VI of the Amended Complaint is the U-5 Form that Prudential submitted to the NASD after terminating him, stating that he was terminated for a "[l]oss of confidence following receipt of complaints alleging inappropriate workplace conduct (non-compliance related). Employee denies the allegations." The essential elements of a defamation claim in Minnesota are that (1) the alleged statements were made, (2) they were communicated to someone other than the plaintiff, (3) they were false, and (4) as a result, the plaintiff's reputation was harmed. Ferrell v. Cross, 557 N.W.2d 560, 565 (Minn. 1997). Prudential argues that Keckhafer fails to state a claim upon which relief can be granted because he cannot establish that the statement Prudential made was a statement of fact that is actionable as a matter of law. Keckhafer contends that the statement that Prudential had a "loss of confidence" in him was false at the time it was made and is a fact that can be proven false. Prudential contends that this "loss of confidence" is a matter of opinion.

The Court disagrees. Whether Prudential management in fact "lost confidence" in Keckhafer is an ascertainable question of fact. Even if such a statement were one of opinion, however, in the context of private plaintiff/ private matter defamation claims, "Minnesota law does not insulate statements of opinion that can reasonably be understood to state facts." Kovatovich v. K-Mart Corp., 88 F. Supp. 2d 975, 990 (D. Minn. 1999) (Erickson, M.J.); Geraci v. Eckankar, 526 N.W.2d 391, 397 (Minn. Ct. App. 1995) (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-21 (1990)). In addition, a private plaintiff can establish "defamation by implication" in a case where "the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts." Diesen v. Hessburg, 455 N.W.2d 446, 450 (Minn. 1990). Based on the foregoing, the Court determines that Keckhafer is not incapable, as a matter of law, of proving facts consistent with the allegations in the Amended Complaint from which a reasonable jury could find that the communication to the NASD constituted an actionable statement. The Court concludes that Prudential has not established that Keckhafer's defamation claim is fatally flawed. Accordingly, the Court will deny the motion as to Count VI.

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that The Prudential Insurance Company of America's Motion to Dismiss the Amended Complaint (Doc. No. 20) is **GRANTED IN PART** as follows: Counts II, III,

IV and V of the Amended Complaint are **DISMISSED WITH PREJUDICE**.

Dated: October 1, 2002

RICHARD H. KYLE
United States District Judge